UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

ANTIONE D. FORD,

                 Petitioner,                      Case No. 1:05-cv-98

v.                                               Honorable Gordon J. Quist

MARY BERGHUIS,

                 Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving terms of 46 to 600 months, 290 to 600 months, and 290 to 600 months' incarceration, imposed by the Kent County Circuit Court on February 7, 2002, after a jury convicted Petitioner on two counts of pandering, MICH. COMP. LAWS § 750.455; two counts of transporting a female for prostitution, MICH. COMP. LAWS § 750.459; and two counts of child sexually abusive activity, MICH. COMP. LAWS § 750.145c(2). Petitioner was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12. In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

I.       The state court committed reversible error by permitting Michael Zwick to invoke the Fifth Amendment to avoid being called as a witness without conducting a full evidentiary hearing to determine whether Zwick had a valid basis for invoking the Fifth Amendment; thereby denying Petitioner due process of law by preventing Petitioner from calling Zwick, whose testimony may have tended to raise a reasonable doubt as to Petitioner's guilt.

II.      The trial court abused its discretion by unreasonably limiting Petitioner's cross-examination of Angelique Epps, a co-defendant who had pleaded guilty in exchange for a plea bargain, and whose credibility was a key factor in this case; thereby

denying Petitioner due process of law by undermining his right to confront a witness against him.

III.     There was insufficient evidence to convict Petitioner on any of the charges against him; Petitioner was thus denied due process of law because he was convicted on less than proof beyond a reasonable doubt.

Respondent has filed an answer to the petition (docket #6) stating that the grounds should be denied because they have no merit.  Upon review and applying the AEDPA standards, I find that grounds one, two, and three are without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from Petitioner's transportation of two girls, aged thirteen and fifteen, from Nebraska to Michigan for the purpose of prostitution.  Petitioner's co-defendant, Angelique Epps, transported the girls with Petitioner and assisted in prostituting them. Petitioner and Epps were each charged with two counts of pandering, two counts of transporting a female for prostitution, and two counts of violation of the Child Sex Abuse Act.  Following a preliminary examination on July 31, 2001 and August 13, 2001, Petitioner and Epps were each bound over on all six charges.  (Prelim. Exam. Tr. vol. II, 130, docket #13.)  Petitioner was tried before a jury beginning on November 28, 2001, and concluding on December 5, 2001.

On the first day of trial, before proceedings began, co-defendant Epps pleaded guilty to some of the six charges against her.  (Trial Tr. vol. I, 5-6, docket #14.)  The same day, potential witness Michael Zwick informed the court that if called to testify he would refuse to do so pursuant to his Fifth Amendment right not to incriminate himself.  (Tr. I, 13-16.)  Zwick, an attorney, had engaged in sexual acts with one of the two victims and had pleaded guilty to state charges against him.  (Tr. I, 10.)  As a result of Zwick's conviction, his license to practice law was suspended

pending sanctions by the state attorney discipline board.  (Tr. I, 13.)  Zwick told the court that, if
called to testify, he would invoke the Fifth Amendment because he feared he could be charged with
additional offenses based on some of his conduct with the two victims.  (Tr. I, 15-16.)  The court
advised Zwick to discuss whether he was able to testify with counsel; and the issue would be
revisited at a later time.  (Tr. I, 17-18.)  The same day, Petitioner's counsel moved to quash counts
5 and 6 alleging child sexually abusive activity.  (Tr. I, 19-20.)

       On the second day of trial, November 29, 2001, the circuit court ruled that unless or
until federal authorities indicated they would not charge Zwick with any federal crimes, Zwick could
invoke his Fifth Amendment right not to incriminate himself.  (Trial Tr. vol. II, 5-7, docket #15.)
The court denied Petitioner's motion to quash counts 5 and 6.  (Tr. II, 12-14.)  A jury was selected.
(Tr. II, 105-06.)

       On the third day of trial, December 3, 2001, it was still unresolved whether Zwick
could testify on behalf of Petitioner without incriminating himself.  (Trial Tr. vol. III, 6-8, docket
#16.)  Outside the presence of the jury, the parties reported to the court that the United States
Attorney had not yet indicated whether he planned to indict Zwick in connection with Zwick's acts
with the victims on July 15 and 16, 2001.  (Tr. III, 8.)  The court instructed the parties to refrain from
mentioning Zwick in their opening statements since it was yet unknown whether Zwick would testify.
(Tr. III, 10.)

       James Vaglica testified that he was working as the head security agent at the Grand
Rapids Inn during the late evening to early morning hours of July 15 to 16, 2001.  (Tr. III, 48.)  He
further stated as follows.  While patrolling the motel, Vaglica was radioed from the front office to
keep his eye on the room that had just been rented by a man.  (Tr. III, 49.)  Vaglica then watched as

a man and two females, one in her 30s and one "quite a bit younger,"entered the motel room.  (Tr. III, 49.)  The two females looked like "hookers."  (Tr. III, 50.)  About ten minutes after the three entered the motel room, Vaglica knocked on the door.  (Tr. III, 52.)  Vaglica believed that in the time that the man and two females were in the room before Vaglica knocked on the door, one of them could have showered and had an act of oral sex performed on him or her.  (Tr. III, 62.)  After what sounded like "scrambling" in the room, the older of the two females opened the door without any clothes on, telling Vaglica to wait while she got dressed.  (Tr. III, 51-52.)  Through the open door, Vaglica saw the young female in the room, unclothed and near the bathroom, and the man, fully clothed.  (Tr. III, 52.)  The man came out and spoke to Vaglica while the females got dressed; Vaglica told the man they had to leave.  (Tr. III, 53.)  The man and two females left quickly.  (Tr. III, 53.) Vaglica believed that in the time between Vaglica's first knock on the door and when the woman initially opened the door was enough time for a person to pull up and adjust his pants.  (Tr. III, 53.)  Vaglica later learned that the room had been registered to a Michael Zwick.  (Tr. III, 54.)

Vaglica further testified that the next day he was asked to remove some items from motel room 250 (a different room than that referenced above) in which an arrest had taken place. (Tr. III, 54-55.)  Everything in room 250 was placed in trash bags and placed in storage until the state police retrieved it.  (Tr. III, 55.)  Vaglica gathered men's clothes, women's clothes in two sizes, and ladies' shampoo from room 250.  (Tr. III, 55-56.)

Vaglica further testified that the man who entered the motel room with the two females was white, and was not Petitioner.  (Tr. III, 57.)  Vaglica never saw Petitioner in the room with the two females.  (Tr. III, 57.)  One of the females that were in the room was white, the other was black. (Tr. III, 58.)  The white female was wearing high boots, a very short dress, and a very tight top.  (Tr.

III, 58.)  Although Vaglica could not see the black female as well because she was partially obscured, he recalled she was wearing a tight outfit.  (Tr. III, 58.)  Vaglica observed the females leave the hotel; he guessed from his observations that the young black female was between 15 and 18 years old.  (Tr. III, 62-63.)

Co-defendant Angelique Epps, 36, wore handcuffs as she testified.  (Tr. III, 64.)  She stated that she had pleaded guilty to charges of transporting females for prostitution and oral sex on a minor, and agreed to testify truthfully at Petitioner's trial, in exchange for the dismissal of other charges against her.  (Tr. III, 64-65.)[1]  Epps further testified as follows.  From the time she was 15 years old, Epps worked as a prostitute.  (Tr. III, 65-66.)  Prior to July 2001, Epps was in Omaha, Nebraska, and first met victims Monique and Mechelle Wise, at the time known as Tanina and Keshia Ford, in an Omaha motel room when Petitioner told Epps he was taking the two girls out of town "to work the streets as [] prostitute[s]."  (Tr. III, 65, 67-68.)  The girls told Epps they were 19 and 20 years old; Epps thought they looked 17 or 18; neither she nor Petitioner checked the girls' ages. (Tr. III, 76.)  At the time, Petitioner was Epps' "man," "almost like a girlfriend/boyfriend thing but on a different level"; Epps gave her prostitution earnings to Petitioner, and Petitioner "pretty much" always drove her when she prostituted.  (Tr. III, 68.)  Epps believed one of the two girls to be Petitioner's cousin, and the other to be Petitioner's sister.  (Tr. III, 65-66.)  The night Epps met the two girls, Petitioner drove Epps and the two girls to "work on the streets" in Omaha; but Epps did not see either girl perform any sex acts that night.  (Tr. III, 68.)  Petitioner had told Epps that both girls had "turned dates" that night, that is, been with men for money.  (Tr. III, 69; Tr. IV, 18.)

---

[1]Epps later clarified that she had only pleaded guilty to one charge of transporting a female for prostitution. (Tr. III, 93-94.)

Epps further testified that when she met the two girls in Omaha, she did not need to teach them how to prostitute because they told her that they already knew how to do it; but Epps did tell the girls how to tell if someone was "vice"; and about the money they'd make.  (Tr. III, 70, 72; Tr. IV,19.)  Epps later testified that she did in fact teach the girls how to prostitute.  (Tr. IV, 35.) Petitioner had told the two girls that they would make a lot of money, travel, and buy expensive cars if they worked as prostitutes, and that they would go to Hawaii.  (Tr. III, 73.)  Petitioner did not have a job; Epps and the two girls gave him the money they earned as prostitutes.  (Tr. III, 74.)  Petitioner drove Epps and the two girls around, and provided them with money for food and clothes.  (Tr. III, 73-74.)

Epps further testified that en route to Michigan the group stopped in Indianapolis for one night.  (Tr. III, 76-77.)  There, Petitioner told Epps to "try to get the girls to work the truck stop" that was next to their hotel.  (Tr. III, 77; Tr. IV, 18.)  Epps told the two girls to knock on trucks doors and ask the drivers if they wanted a date, and then "go from there."  (Tr. III, 77-78.)  The girls were stopped by truck stop security guards and went back to their hotel room.  (Tr. III, 78-80.)  The next morning, Petitioner drove them to Grand Rapids, where they checked into room 250 at the Grand Rapids Inn, rested, then at Petitioner's behest, "went to work" that night.  (Tr. III, 80-81, 83.) Petitioner drove Epps and the two girls to the Division and Wealthy street area.  (Tr. III, 84.)  Epps saw Mechelle leave with a man in a car and come back.  (Tr. III, 84-85.)  Epps and Monique then both went with a man to his room (not room 250) at the Grand Rapids Inn.  (Tr. III, 86-87.)  The man paid Epps $150.  (Tr. III, 89.)  Epps then took off her shirt and bra and Monique took off all her clothes.  (Tr. III, 87.)  Epps gave oral sex to Monique.  (Tr. III, 88.)  Then Epps and Monique got into bed with the man and Monique gave the man oral sex after putting a condom on his penis.  (Tr. III,

88.)   Monique was hesitant and unenthusiastic about getting into the bed with Epps.  (Tr. IV, 23.)
A couple minutes later, a security guard knocked on the door and said they'd have to leave; they
responded "hold on, we need to get dressed"; and the man opened the door while Epps and Monique
hurried to get dressed.  (Tr. III, 88-89.)  Epps and Monique then took a cab back to the Division and
Wealthy street area to go back to work.  (Tr. III, 89-90.)  About twenty minutes later, Epps saw
Petitioner in a car with Monique and Mechelle.  (Tr. III, 90.)  Petitioner argued with Epps about
money because Epps was concealing the fact she'd been paid $150 by the man in room 250.  (Tr. III,
90.)  The police pulled up; one followed Epps down the street, another followed Mechelle.  (Tr. III,
90-91.)  That night, Epps was arrested and never retrieved her belongings from room 250.  (Tr. III,
91.)

On cross-examination, the prosecution objected when Petitioner's counsel asked Epps
whether she'd been convicted for prostitution and solicitation in six to ten states.  (Tr. III, 96.)
Petitioner's counsel argued the convictions were relevant to Epps' credibility because they pertained
to moral turpitude.  (Tr. III, 96.)  The court sustained the prosecution's objection under MICH. R.
EVID. 609.  (Tr. III, 96.)  Petitioner's counsel then asked Epps whether she'd used 43 different aliases
over the years as a prostitute; Epps did not recall precisely how many, but conceded she'd used "a
few" aliases.  (Tr. III, 97.)  When Petitioner's counsel began asking Epps about specific names Epps
had used in the past, the prosecution objected to questioning on each and every individual name; the
court sustained the objection.  (Tr. III, 97-98.)  Epps admitted that she gave different birth dates and
social security numbers when she was arrested.  (Tr. III, 98-99.)  She further admitted to having an
unspecified "criminal history" in California, Florida, and Georgia before the prosecution objected

because that line of questioning was not proper impeachment.  (Tr. III, 99.)  The trial court sustained

the objection, stating:

> Well, ladies and gentlemen, a person may have their believability or credibility tested by virtue of convictions of prior crimes regardless of where they are[,] provided that those crimes are of a certain class or charac – category, and I'm afraid I'm going to have to sustain the objection unless there's a showing that these are crimes of dishonesty or false statement, or the second category is if they have an element of theft.  Other crimes are not to be used for impeachment purposes and I have to instruct the jury in that regard.

> Of course, you're free to believe all, none, or part of any person's testimony.  The question of conviction of a prior crime of dishonesty or false statement or a crime containing elements of theft may also be evidence which you, members of the jury, may find helpful in assessing the credibility or believability of this witness.

> But we'll have to be more specific, [Petitioner's counsel], with regard to the nature of the crime regardless of where it occurred . . . before I can permit additional questioning.

(Tr. III, 99-100.)  Epps admitted to having been convicted for theft in Hawaii.  (Tr. III, 100.)

Epps further testified on cross that Petitioner, not Epps, told the two victims they could

go to Hawaii, make a lot of money, and "get cars."  (Tr. III, 100, 101.)  In Omaha, Petitioner would

drive Epps to a particular place on the street, they'd both get out, and Epps would "go to work,"

making money for Petitioner.  (Tr. III, 103, 107.)  Petitioner would then return and tell Epps whether

he wanted her to continue working or go home for the night.  (Tr. III, 103-04.)  Epps took the two

girls out prostituting right away on the night she met them.  (Tr. III, 106.)  Petitioner, Epps, and the

two victims left Omaha with some friends of Petitioner's because Epps was avoiding a jail sentence.

(Tr. III, 108-110.)  The two victims wanted to leave Omaha with Petitioner and Epps.  (Tr. III, 111;

Trial Tr. vol. IV, 4-5, docket #17.)  Petitioner paid for the trip to Indianapolis and Grand Rapids with

Epps' money.  (Tr. IV, 5.)

Epps further testified on cross as follows.  She had been to Grand Rapids before, and

when the group left Indianapolis, Epps read a map and directed Petitioner to Grand Rapids.  (Tr. IV,

6-7.)  Petitioner asked Epps a lot of questions about pimping because he was new to it.  (Tr. IV, 13-14.)  Whenever the police stopped Petitioner, Epps, and the two victims, they told police that the two victims were relatives of Petitioner.  (Tr. IV, 20-21.)  Although she did not have to "teach" the two victims how to prostitute because they already knew how, Epps did help Petitioner bring them to Grand Rapids.  (Tr. IV, 32.)

Francine Wise testified that she worked in Omaha, Nebraska and had two daughters, Monique and Mechelle.  (Tr. IV, 36.)  Wise further testified as follows.  Both of her daughters had been in her care, but ran away near the end of June 2001.  (Tr. IV, 36-39.)  At the time they ran away, Mechelle was 13 years old and Monique was 15 years old.  (Tr. IV, 38.)  The Michigan State Police contacted Wise and she traveled to Grand Rapids to retrieve the two girls.  (Tr. IV, 39.)  Monique had run away in the time since Wise had taken her back to Nebraska.  (Tr. IV, 39-40.)

Mechelle Wise testified as follows.  Prior to July 15, 2001, she lived in Omaha, Nebraska.  (Tr. IV, 42.)  One night Mechelle was at a gas station drinking with her sister and a friend when a man named "Fats" asked if they wanted to go somewhere with him and his friends.  (Tr IV, 42-44.)  Mechelle was drunk.  (Tr. IV, 62-63.)  Petitioner was driving the car they got into.  (Tr. IV, 43.)  They went to a hotel and met Angelique, talked for awhile about leaving Omaha, and went to sleep.  (Tr. IV, 44.)  The next morning, Mechelle was asked again whether she wanted to leave Nebraska; she said 'yes' because she thought it would be "fun."  (Tr. IV, 44, 68.)  No one told Mechelle that she would have to do anything if she left Omaha with the group. (Tr. IV, 44-45.)  Before leaving Nebraska, Epps and Petitioner took Mechelle to downtown Omaha "because [Epps] was a prostitute and to take money."  (Tr. IV, 45.)  Epps told the two girls "to get somebody in a car and take their money and go."  (Tr. IV, 45-46.)  Petitioner told the two girls that he wanted them to "do the same thing that [Epps] was doing," and to "get in the car and take the money and then go."

- 9 -

(Tr. IV, 47.)  Petitioner did not mention doing sex acts, but only told the girls to take money.  (Tr. IV, 50.)  Petitioner told Mechelle to say her name was Tanina Ford and Monique to say her name was Keisha Ford.  (Tr. IV, 48.)  Petitioner also gave the girls dates of birth to give police if the police stopped them, so they could say they were older than 18.  (Tr. IV, 48,-49.)  Petitioner never asked the girls how old they really were.  (Tr. IV, 48-49.)  In downtown Omaha, Mechelle got into a car and took money but did not perform any sex acts.  (Tr. IV, 50, 68, 80.)

Mechelle further testified that after the incident in downtown Omaha, the group drove to Indianapolis.  (Tr. IV, 45, 50.)  She and her sister already had bags with them because they had run away from home.  (Tr. IV, 51.)  Mechelle, Monique, Epps, Petitioner, and Petitioner's friends stayed in an Indianapolis motel.  (Tr. IV, 51.)  They went to downtown Indianapolis, but left right away because Epps said there were no prostitutes there.  (Tr. IV, 51.)  Petitioner then told Mechelle and Monique to walk over to the truck stop, get in the truck if a driver flashed his lights, take his money, and get out of the truck.  (Tr. IV, 51-52.)  Petitioner did not tell the girls to do anything other than take money from the truck drivers.  (Tr. IV, 52.)  A police officer stopped Mechelle and Monique in the truck stop parking lot, so they left.  (Tr. IV, 52-53.)

Mechelle further testified that the group proceeded to Grand Rapids, Michigan; Petitioner drove them.  (Tr. IV, 53, 60.)  In Michigan, Petitioner told the two girls that if they wanted to stay with him they would have to prostitute.  (Tr. IV, 53, 60.)  Petitioner paid for the girls' meals and shelter in Michigan with money Epps earned prostituting.  (Tr. IV, 53.)  Epps gave the two girls prostituting clothes to wear.  (Tr. IV, 54.)  Petitioner drove Mechelle, Monique, and Epps to "the street" in Grand Rapids and they walked up and down the street.  (Tr. IV, 54-55.)  Petitioner instructed the girls to make money prostituting and give the money to Petitioner.  (Tr. IV, 55.)  That night, Mechelle got into a car with a man who asked her to play with his penis with her hand, which

- 10 -

she did; the man then gave Mechelle $30.00, which she gave to Epps to give to Petitioner.  (Tr. IV, 56, 85.)  That night Mechelle saw Epps and Monique get into a truck with a man; Monique told Mechelle what had happened when they had returned.  (Tr. IV, 57.)  Later that night, Mechelle heard Petitioner and Epps in Petitioner's car in a gas station parking lot arguing about money.  (Tr. IV, 58.)  Epps said they were not making enough money; Petitioner said that there was a lot of money out there and that they needed money.  (Tr. IV, 58.)  A police officer then pulled up and the girls gave the names Petitioner had told them to give to police.  (Tr. IV, 58-59.)  The police told Mechelle that Monique had already told them the two girls' real names and ages.  (Tr. IV, 59.)  The police took the girls to the hotel to get their things, and their mother then picked them up the next morning.  (Tr. IV, 59-60.)  On one occasion, Mechelle did not want to go out to the street because her stomach hurt from a mass on her ovary.  (Tr. IV, 60-61, 84-85.)  Petitioner "nudged" her in the stomach, so she went out to the street.  (Tr. IV, 60-61.)

Monique Wise testified as follows.  Prior to July 2001, she lived with her mother in Omaha, Nebraska, but ran away, taking her sister Mechelle with her.  (Tr. IV, 92-93.)  Monique met Petitioner at a store the night she ran away.  (Tr. IV, 94-95.)  That night, she, Mechelle, Angelique Epps, and Petitioner stayed in an Omaha hotel together.  (Tr. IV, 96.)  When they woke up, Petitioner drove them to downtown Omaha because Petitioner wanted Epps to show the two girls how she worked.  (Tr. IV, 96-97, 100, 116.)  Petitioner said the girls would give Petitioner the money they earned prostituting, and they could eventually live in Florida or Hawaii.  (Tr. IV, 97.)  That night, Monique got into a car with a man who wanted to have sex with her, took some money from him without having sex with him, and gave the money to Petitioner.  (Tr. IV, 100-01, 117-19, 123-24.)  Later that night, a police officer approached them, asked their names, and told them to leave; they then returned to their hotel room.  (Tr. IV, 100.)  Petitioner never asked Monique or Mechelle their

real ages.  (Tr. IV, 97, 117.)  Petitioner gave each of them names and ages to give to police if asked: Keisha Ford and Tanina Ford.  (Tr. IV, 97-98.)

Monique further testified that the group then left Omaha; Petitioner drove them. (Tr. IV, 101-02.)  In the first state they stopped in, they looked for places where prostitutes worked and ended up at a truck stop; Epps told them how to work the truck stop.  (Tr. IV, 102-03.)  They were told to "get some money and give it to [Petitioner]."  (Tr. IV. 103, 120.)  Epps told Monique to start prostituting because they were not making any money.  (Tr. IV, 121.)  A security officer told them to leave.  (Tr. IV, 102-03.)  Monique did not want to become a prostitute when she left Omaha. (Tr. IV, 129.)  Monique called her mother when the group was in Indianapolis.  (Tr. IV, 130.)

Monique further testified that Petitioner drove the group from Indianapolis to Grand Rapids.  (Tr. IV, 103-04.)  They checked into a hotel and Petitioner and Epps asked Monique to work the streets to make money.  (Tr. IV, 104.)  Petitioner dropped Monique, Mechelle, and Epps off on a street in Grand Rapids.  (Tr. IV, 104.)  Epps left for awhile; then returned with a white man who wanted two girls.  (Tr. IV, 105, 121-22.)  The man chose Monique so she, Epps and the man left in the man's car.  (Tr. IV, 105.)  The three went to a hotel room at the same hotel at which they were staying. (Tr. IV, 105.)  Epps told Monique to wash up, get undressed, and get into the bed, which Monique did.  (Tr. IV, 105-06.)  Epps got undressed and kissed Monique's breasts and licked Monique's vagina.  (Tr. IV, 106.)  Epps had to tell Monique to "get into it" because Monique "wasn't doing anything" and was trying to move away from Epps.  (Tr. IV, 106.)  Someone put a condom on the man and Monique had started to give the man oral sex when the hotel manager knocked on the door.  (Tr. IV, 107.)  Monique and Epps went into the bathroom to get dressed; when they emerged, the manager told them to leave.  (Tr. IV, 107.)   Monique and Epps took a cab back to the street

- 12 -

where Petitioner was waiting.  (Tr. IV, 107.)  Epps gave some of the money the man had given her to Petitioner, and put the rest of it in her boot.  (Tr. IV, 109, 122-23.)

Monique further testified that later that night, Epps and Petitioner argued in Petitioner's car while in a gas station parking lot.  (Tr. IV, 108.)  A police officer pulled up; Monique lied to the officer at first, then told him who they really were.  (Tr. IV, 109.)  The police took the two girls to "Kids First."[2]  (Tr. IV, 109.)  The next day, their mother retrieved the two girls and took them back to Omaha.  (Tr. IV, 110.)  Monique never had a medical examination.  (Tr. IV, 110.)  After Monique had returned to Omaha, a friend of Petitioner's threatened her about testifying.  (Tr. IV, 111.)

Michigan State Police Trooper Gary Oliver testified as follows.  On July 15-16, 2001, Oliver was on duty with his partner Ken Cyrus patrolling the corner of Division and Wealthy Streets in Grand Rapids, an area associated with prostitution and drugs.  (Trial Tr. V, 3-4, docket #18.)  At about 1:05 a.m. on July 16, the troopers noticed a red car in a gas station parking lot; two black females and one white female stood outside the car.  (Tr. V, 4, 24.)  The scene appeared to involve prostitution, drugs, or both.  (Tr. V, 17, 21.)  The three females were dressed like prostitutes, and they looked very young, approximately 12 years old.  (Tr. V, 4-5, 18.)  The troopers pulled into the parking lot and the three females started to walk away; the troopers stopped one of them as she walked by the patrol car.  (Tr. V, 5, 18, 20.)  Trooper Cyrus' testimony echoed that of Trooper Oliver on these points.  (Tr. V, 46-49.)  The girl gave a name like Keisha or Latisha to Trooper Cyrus and said she was 19; the troopers were unable to verify that information in their computer database.  (Tr. V, 6, 19, 49.)

---

[2]Trooper Cyrus later testified that Kids First is a temporary source of food and shelter for minors before they are placed in foster care.  (Tr. V, 53-54.)

Trooper Oliver spoke with Petitioner who was still sitting in the car driver's seat. (Tr. V, 6-7.) Oliver did not indicate to Petitioner that he was free to leave the scene if he wanted to, but the patrol car did not completely block Petitioner's car, either. (Tr. V, 9-10, 60-62.) Petitioner told Oliver he was from Omaha, visiting friends in Grand Rapids, but was unable to name the relatives. (Tr. V, 12.) Petitioner denied knowing the three females. (Tr. V, 12.) After the girls told the troopers they were in Grand Rapids to prostitute, the troopers arrested Petitioner and Epps for transporting minors across state lines. (Tr. V, 12, 52.) Oliver then searched the car and retrieved Mechelle's and Monique's purses and jackets. (Tr. V, 13.) The Grand Rapids Police Department took Petitioner and Epps to the Kent County Jail. (Tr. V, 13.) Oliver and Cyrus took Mechelle and Monique to the Grand Rapids Inn to retrieve their other belongings. (Tr. V 13, 27-28.) During his pat-down search of Petitioner, Oliver found $461.10 in Petitioner's right front pants pocket which Oliver confiscated, believing it to be proceeds from illegal activity. (Tr. V, 14, 20, 26.) The troopers took Mechelle and Monique to Kids First; there, the girls expressed concern about retribution to the troopers. (Tr. V, 15-16.) Petitioner's counsel objected to the "retribution" testimony; the court sustained the objection and instructed the jury to disregard the statement. (Tr. V, 16.) The girls' mother retrieved them before a medical examination could be conducted on either. (Tr. V, 16.)

Oliver further testified that the following night, July 16, 2001, he returned to the Grand Rapids Inn as a result of something Monique told him. (Tr. V, 30-31.) He did not search the room, but retrieved a copy of a photo identification card from the front desk that belonged to a Mr. Zwick, who was a suspect in a prostitution complaint involving Epps and Monique. (Tr. V, 31, 44-45.) Zwick's identification card had been placed under room 235 of the Grand Rapids Inn on July 15, 2001. (Tr. V, 45.) Trooper Cyrus' testimony matched Oliver's on these points. (Tr. V, 54, 77.)

Out of the presence of the jury, the court allowed the parties to ask questions of Mr. Zwick on the record.  (Tr. V, 36.)  Petitioner wanted Zwick to testify on his behalf; Zwick reiterated that if asked to testify he would invoke his Fifth Amendment right against self-incrimination, because he had been told that federal authorities could possibly charge him with a federal crime arising from the July 15 hotel room incident.  (Tr. V, 37, 39-40.)  Federal authorities had not granted Zwick immunity.  (Tr. V, 40.)  Petitioner's counsel responded that it was his understanding that the United States Attorney did not intend to charge Zwick with any federal crime.  (Tr. V, 37.)  The court was persuaded that no federal immunity had been granted to Zwick, and, thus, if Zwick intended to invoke his Fifth Amendment rights, Petitioner could not call him to testify.  (Tr. V, 38-41.)  Petitioner's counsel argued that he wanted Zwick's testimony to establish contradictions in Epps' testimony and to establish that Zwick had no idea who Petitioner was and had never seen him on the night in question, thereby placing doubt on Petitioner's involvement in the incident.  (Tr. V, 41-42.)   The court reiterated its ruling that whatever Petitioner sought to obtain from Zwick's testimony was barred because Zwick intended to invoke his Fifth Amendment rights.  (Tr. V, 42-43.)

Trooper Cyrus supplemented Trooper Oliver's testimony as follows.  When he entered Monique's real name into his computer database on the night of the arrest, the database indicated that she and her sister Mechelle were runaways.  (Tr. V, 51.)  Officers found $120 on Epps the night of the arrest.  (Tr. V, 52.)  Cyrus perceived the two girls to be frightened of Petitioner and Epps.  (Tr. V, 54.)

Michigan State Police Detective-Sergeant Bill Sybesma testified as follows.  On July 18, 2001, Sybesma retrieved and inventoried four bags of personal belongings from the Grand Rapids Inn that had been removed from room 250.  (Tr. V, 80-81, 85-86.)  Sybesma was looking for evidence, but had not obtained a search warrant prior to taking these items.  (Tr. V, 90-91.)

When the prosecution's case concluded, Petitioner moved for a directed verdict of not guilty on all six charges against him.  (Tr. VI, 3, docket #19.)  He argued that, even viewing the evidence in a light most favorable to the prosecution, it had not proven its case beyond a reasonable doubt.  (Tr. VI, 3.)  The court denied the motion, ruling that all of the elements of each offense had been met sufficiently to present the case to the jury.  (Tr. VI, 4-5.)  The court noted the following evidence in so ruling: Mechelle and Monique were "15 and 13" when they left Omaha; Petitioner drove the girls from Omaha to Grand Rapids for the purpose of prostitution and paid for their food, lodging, and clothes en route; each girl had sexual activity with at least one man; Petitioner persuaded or encouraged each girl to perform sex acts for money; and Petitioner gave each girl a false name and birth date.  (Tr. VI, 4-6.)  The court noted, "[i]t strains credibility that [Petitioner] was just an innocent chauffeur with no eye and a tin ear."  (Tr. VI, 5.)

On December 5, 2001, the jury found Petitioner guilty on all six counts charged. (Tr. VI, 78-79.)  On February 7, 2002, Petitioner was sentenced, as a fourth habitual offender, to serve concurrent terms of 46 to 600 months for the pandering convictions; 290 to 600 months for the transportation for prostitution convictions; and 290 to 600 months for the child sexually abusive convictions.  (Sentencing Tr., 9-10, docket #20.)

**B.  Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on October 10, 2002, raised the same three issues as those raised in his current habeas application.  (*See* Def.-Appellant's Br. on Appeal, docket #21.)  Petitioner filed a motion to remand for a *Ginther* hearing,[3] which the Michigan Court of Appeals denied on July 22, 2003.  (*See*

---

[3]*People v. Ginther*, 212 N.W.2d 922 (Mich. 1973) (requiring a hearing, findings, and a court ruling when a defendant claims his assigned lawyer is inadequate or deficient.)

7/22/03 Mich. Ct. App. Order, docket #21.)  By unpublished opinion issued on September 11, 2003,

the court of appeals rejected all three appellate arguments and affirmed Petitioner's convictions and

sentences.  (*See* 9/11/03 Mich. Ct. App. Op., docket #21.)

Petitioner filed a *pro per* application for leave to appeal in the Michigan Supreme

Court.  In his application, Petitioner raised the same three claims raised before and rejected by the

Michigan Court of Appeals.  (*See* 10/21/03 Delayed Pro Per Application for Leave to Appeal, docket

#22.)  By order entered on February 27, 2004, the Michigan Supreme Court denied his application

for leave to appeal because it was not persuaded that it should review the questions presented.  (*See*

2/27/04 Mich. Order, docket #22.)  Petitioner did not seek any further post-conviction relief.

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits

in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established federal law as determined by the Supreme Court of

the United States; or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme

Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law,

unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to habeas relief.

## Discussion

### A. Ground I: potential witness Zwick's invocation of the Fifth Amendment

Petitioner argues that the trial court violated his constitutional rights to due process, to present a defense, and to obtain witnesses in his favor when it precluded Petitioner from calling Michael Zwick as a witness based only on Zwick's intention to invoke his right against self-incrimination if called. (Pet. Att. "A," p. 2; Mem. Of Law in Support, pp. 1-4.) Petitioner claims that Zwick's fear of federal prosecution for the events of July 15 was unreasonable and unfounded; and that it was ultimately the duty of the trial court, via a formal hearing, to determine whether federal charges would in fact be pursued against Zwick to justify Zwick's invocation of the privilege. (Pet.

Att. "A," pp. 2-3; Mem., p. 2)  Petitioner further argues that Zwick's testimony would have established that Petitioner: (a) was not present during Zwick's transaction with Epps and Monique; (b) was not the "ring leader" or "master-mind" of the July 15 incident; (c) supplied only transportation to the transaction; and, therefore, (d) Epps, not Petitioner, was "in command." (Pet. Att. "A," p. 2; Mem., pp. 3-4.)

The Michigan Court of Appeals held as follows on Ground I:

Defendant initially argues that the trial court erroneously permitted a witness, Michael Zwick, to invoke the Fifth Amendment privilege against self-incrimination. We disagree.  A trial court's evidentiary decisions are reviewed for an abuse of discretion.  *Barrett v Kirtland Community College*, 245 Mich App 306, 325; 628 NW2d 63 (2001).  To the extent this involves a preliminary question of law, our review is de novo.  *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

Under the Fifth Amendment, an individual may refuse to testify at any criminal proceedings where the answers could incriminate him in a future criminal proceeding.  *People v Wyngaard*, 462 Mich 659, 671-672; 614 NW2d 143 (2000). However, this privilege against self-incrimination may not be asserted unless the trial court determines that there is a reasonable basis for a witness to fear incrimination. *People v Dyer*, 425 Mich 572, 578; 390 NW2d 645 (1986).  "[A] trial court may compel a witness to answer a question only where the court can foresee, as a matter of law, that such testimony could not incriminate the witness."  *Id*. at 579.  Thus, it is for the trial court to decide whether a witness' silence is justified based on the facts of the evidence.  See *People v Joseph*, 384 Mich 24, 29-30; 179 NW2d 383 (1970).

Mr. Zwick is the individual who allegedly paid Ms. Epps and Monique to perform sexual acts in his hotel room.  At the time of trial, Mr. Zwick was a trial attorney with a suspended license and was facing further disciplinary proceedings. He pleaded guilty to state charges arising out of the solicitation of Ms. Epps and Monique prior to [Petitioner's] trial. [Petitioner] sought to call Mr. Zwick as a witness to impeach Ms. Epps and Monique.  Mr. Zwick informed the trial court and counsel that he would assert his Fifth Amendment privilege if called as a witness.

The trial court questioned Mr. Zwick several times on this matter outside the presence of the jury.  During these sessions, the trial court noted that there were no further criminal charges pending against Mr. Zwick from the state.  However, the trial court acknowledged the possibility that federal charges could be levied against Mr. Zwick under the Mann Act.  In response, defense counsel informed the trial court that after speaking with the United States Attorney's office, it was his understanding that they did not intend to indict Mr. Zwick because the state had already brought charges against him.  Defense counsel also asserted that the prosecution could grant Mr.

- 20 -

Zwick immunity from federal prosecution – a claim that the prosecution denied. Nevertheless, Mr. Zwick informed the trial court that he had not been granted immunity by the federal government. The trial court stated that it did not know of any policy that absolutely precluded the federal authorities from charging an individual with a federal crime because the same transgression had already been punished by the state.

We find no error requiring reversal. Without evidence that Mr. Zwick was granted immunity from federal prosecution, it was within the trial court's discretion to conclude that Mr. Zwick's testimony might be used to incriminate him in future federal proceedings.

(Mich. Ct. App. Op., 2-3, docket #21.)

The United States Supreme Court has consistently held that if a witness demonstrates that testimony he might give in a particular proceeding could be used in a criminal proceeding against him, he is entitled to invoke the Fifth Amendment privilege. *See United States v. Balsys*, 524 U.S. 666, 671-72 (1998). Petitioner correctly asserts that a trial court is required to make the determination of whether a witness' answers to questions might incriminate that witness. *See Malloy v. Hogan*, 378 U.S. 1, 34 (1964) (citing *Mason v. United States*, 244 U.S. 362, 364-65 (1917)); *Rogers v. United States*, 340 U.S. 367, 374-75 (1951). Petitioner is not correct, however, in alleging that the trial court "abdicated its role" to determine whether Zwick in fact had a valid basis to invoke the Fifth Amendment, and merely took Zwick's word for it. (Mem., pp. 2-3.) The trial court fully complied with Supreme Court precedent when it determined, over the course of at least three hearings on the matter, that because the United States Attorney had not granted Zwick immunity in potential proceedings against him, there was a chance that Zwick could incriminate himself if he testified at Petitioner's trial. (*See* Tr. I, 13-18; Tr. II, 5-7; Tr. III, 6-8, 10; Tr. V, 36-43.) *See Balsys,* 524 U.S. at 671-72; *Malloy*, 378 U.S. at 34; *Rogers*, 340 U.S. at 374-75.

I furthermore note that there remained ample evidence to convict Petitioner on all six charges against him, even if, as Petitioner's counsel offered, Zwick would necessarily have

established points (a) through (d) above.  I recommend that Petitioner be denied habeas relief on Ground I.

### B. Ground II: limitation of Petitioner's cross-examination of witness Epps

Petitioner next argues that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights to due process and to confront a witness against him when it limited his cross-examination of co-defendant Angelique Epps.  (Pet. Att. "B," pp.3, 5; Mem., pp. 4-7.)  As set forth above, the court sustained the prosecution's objections to two lines of questioning pursued by Petitioner's counsel: (a) her convictions of crimes in other states, without information as to whether the crimes were in the categories of dishonesty, false statement, or theft; and (b) each and every particular name Epps used throughout her career as a prostitute.  (Tr. III, 96-100.) Petitioner contends that latitude on these questions would have enabled him to show that Epps, not Petitioner, master-minded the incidents of July 2001.  (Pet. Att. "B," p. 4; Mem., pp. 5-6.)  He argues that the only way the jury could "fairly judge" the master-mind issue specifically, and Epps' credibility generally, was to be given "complete information on Epps' extensive background as a prostitute and as a criminal."  (Pet. Att. "B," pp. 4-5; Mem., pp. 4-7.)  Petitioner ultimately claims that he was "deprived of the opportunity to bring to the jury the full picture of this prosecution[ ] witness."  (Mem., p. 6.)

The Michigan Court of Appeals held as follows on Ground II:

[Petitioner] further contends that the trial court unreasonably limited his cross-examination of co-defendant Angelique Epps. Specifically, [Petitioner] notes the portion of the record where the trial court prevented him from questioning Ms. Epps regarding that fact that she has been convicted of prostitution and solicitation in several states.  [Petitioner] asserts that this testimony went to the key issue of whether Ms. Epps or [Petitioner] "masterminded the acts giving rise to this prosecution."

After reviewing the record, we find no merit to [Petitioner's] claims that the trial court acted improperly.  Pursuant to MRE 609:

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall not be admitted unless the

- 22 -

evidence has been elicited from the witness or established by public record during cross-examination, and

(1) the crime contained an element of dishonesty or false statement, or
(2) the crime contained an element of theft . . . .

We nevertheless note that [Petitioner] was able to elicit the fact that Ms. Epps had been engaged in  prostitution for twenty-two years and that she repeatedly lied to the police in the past regarding her name, birth date, and social security number.

(Mich. Ct. App. Op., 3, docket #21.)

The Michigan Court of Appeals' decision regarding Petitioner's cross-examination of Epps did not offend any constitutional tenets.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry into whether evidence was properly admitted or excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, this Court may not grant relief because it would have decided the evidentiary question differently.  The Court may only grant relief if Petitioner is able to

- 23 -

show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met any of these standards. The trial court's restriction of Petitioner's cross-examination of Epps under state rules of evidence did not offend any principles of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *See Seymour*, 224 F.3d at 552. Nor did the trial court run afoul of any Supreme Court precedent when it precluded Petitioner's cross-examination of Epps regarding her general, unspecific "criminal history," and required him to ask her about crimes of dishonesty, false statement, or theft. As the Michigan Court of Appeals noted, Petitioner was able to get into evidence Epps' long history as a prostitute, at least one conviction for theft, and her use of false names as a prostitute. (Tr. III, 65-66, 100.) I note that the Supreme Court decisions Petitioner cites are distinguishable from the present case on a number of bases, not the least of which is that none were decided under the AEDPA.[4] The Michigan Court of Appeals' decision on Ground II was "far from 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'" as required by 28 U.S.C. § 2254(d). *See Clark v. O'Dea*, 257 F.3d 498, 502 (6th Cir. 2001); *see also Bugh,* 329 F.3d at 512. Habeas relief is therefore not warranted on Ground II.

---

[4]*See* Mem., p. 6, citing *Davis v. Alaska,* 415 U.S. 308, 320-21 (1974) (holding, in non-habeas case, that the prosecution's desire that its witness be able to testify without the embarrassment attendant to revealing his juvenile court record must give way to the defendant's right to cross-examine the witness on matters affecting his credibility); *Smith v. State of Ill.*, 390 U.S. 129, 132-33 (1968) (holding that prohibiting habeas petitioner from asking primary prosecution witness his name and address violated the Confrontation Clause); *Alford v. United States*, 282 U.S. 687, 693-94 (1931) (upholding, in non-habeas case, defendant's right to impeach a witness by showing that because of the witness' incarceration in federal prison at the time of trial, the witness' testimony was biased).

### C. Ground III: insufficiency of the evidence on all counts

Petitioner finally argues that he was denied due process of law because he was convicted without proof beyond a reasonable doubt on each and every element of the six offenses for which he was charged.  (Pet. Att. "C," pp. 6-10; Mem., pp. 7-13.)  He contends that, while there was "some evidence" and "some testimony" against him, when that evidence is "evaluated in context, it leads to the unavoidable conclusion that a jury, acting rationally, could not have found Petitioner guilty beyond a reasonable doubt."  (Pet. Att. "C," p. 8; Mem., p. 12.)  Petitioner specifically argues that he was wrongly convicted based on the testimony of Mechelle Wise, Monique Wise, and Angelique Epps.  He argues that Epps' testimony was "suspect on a number of counts"; and that Mechelle's and Monique's testimony that they did not already know how to prostitute was "absurd."  (Pet. Att. "C," pp. 8-9; Mem., pp. 10-11.)   Petitioner asserts that the three witnesses' testimony in fact shows Petitioner was merely "along for the ride"; and did not "gain anything material" from the prostitution of Epps or either of the two victims.  (Pet. Att. "C," pp. 9-10; Mem., pp. 11-12.)

The Michigan Court of Appeals held as follows on Ground III:

[Petitioner] ultimately asserts that there was insufficient evidence to support his convictions.  We disagree.  In sufficiency of the evidence claims, this Court reviews the evidence in the light most favorable to the prosecution and determines whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.  *People v Hunter*, 466 Mich 1, 6; 643 NW2d 218 (2002).  "[C]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime."  *People v Lee*, 243 Mich App 163, 167-168; 622 NW2d 71 (2000).

[Petitioner's] argument concerning the sufficiency of the evidence essentially revolves around the credibility of the witnesses.  While [Petitioner] admits that there was some evidence presented against him, he contends that a rational jury could not have found him guilty because the prosecution's witnesses were highly suspect and incredible. [Petitioner] also notes that there were discrepancies between preliminary examination testimony and the testimony at trial.  However, the jury was presented with these facts and found the prosecution's witnesses to be more credible.  We will not interfere with the jury's role of determining the weight of the evidence or the

credibility of witnesses. *People v Avant*, 235 Mich App 499, 506; 597 NW2d 864 (1999).  Viewing the evidence presented in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that [Petitioner] was guilty beyond a reasonable doubt of the charged offenses. *Hunter, supra* at 6.  (Mich. Ct. App. Op., 3-4, docket #21.)

A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*   Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The Michigan Court of Appeals fully conformed with the *Jackson* standard when it concluded that a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt of the charged offenses.  The elements of pandering are, *inter alia*, to " . . . induce, persuade, encourage . . . or entice a female person to become a prostitute." MICH. COMP. LAWS § 750.455; *see also People v. Morey,* 603 N.W.2d 250, 252-53 (Mich. 1999).  This particular section of the pandering statute was "created to penalize individuals who induce females who have not already engaged in prostitution to begin doing so."  *Morey*, 603 N.W.2d at 252-53.  Evidence at trial established that Petitioner encouraged and/or induced Mechelle and Monique to prostitute themselves in Grand Rapids by telling the two runaways that if they wanted to stay with him, they needed to

- 26 -

prostitute themselves; and that they could make a lot of money prostituting, with which they could travel and buy cars.  (*See* Tr. III, 73-74, 100-01; Tr. IV, 53-55, 60, 97.)  Testimony also established that neither of the girls had previously engaged in prostitution; in fact there was evidence that each girl was apprehensive and/or hesitant to engage in sex acts in Grand Rapids.  (*See* Tr. III, 73-74; Tr. IV, 23, 35, 60-61, 84-85, 105-06, 129-30.)  Viewed in a light most favorable to the prosecution, this testimony supports Petitioner's conviction for pandering on each element beyond a reasonable doubt.

A person is guilty of transporting a female for prostitution if he "knowingly transport[s] . . . for . . . conveyance, into, through or across [Michigan], any female person for the purpose of prostitution or with the intent . . . to induce, entice or compel such female person to become a prostitute."  MICH. COMP. LAWS § 750.459; *see also People v. Green*, 332 N.W.2d 610, 612 (Mich. 1983).  Trial evidence established that Petitioner knowingly drove Mechelle and Monique from Omaha to Grand Rapids, where he induced the girls to prostitute in the Division and Wealthy Streets area.  (*See* Tr. III, 80-84; Tr. IV, 53, 60, 103-04.)  There was also testimony that the two girls gave the money they earned prostituting to Petitioner.  (*See* Tr. III, 74, 89-90; Tr. IV, 109, 122-23.)  This evidence established each element of transporting a female for prostitution beyond a reasonable doubt.  *See Green*, 332 N.W.2d at 612.

A person engages in child sexually abusive activity if he "arranges for . . . or . . . attempts or prepares or conspires to arrange for . . . any child sexually abusive activity [defined as a child engaged in a listed sexual act]."  MICH. COMP. LAWS § 750.145c(2).  The applicable statute defines a "child" as a person who is less than 18 years old.  MICH. COMP. LAWS § 750.145c(1)(b).  Trial testimony established that Mechelle and Monique Wise were each well under 18 during the events of July 2001.  (*See* Tr. IV, 38.)  Evidence further established that Petitioner arranged to have Epps instruct the two girls on certain aspects of prostituting, and told the girls they would have to

- 27 -

prostitute to stay with Petitioner in Grand Rapids.  (*See* Tr. IV, 53-55, 60.)  Testimony abounded that Petitioner drove the two girls to and dropped them off at Division and Wealthy streets in Grand Rapids to prostitute.  (*See* Tr. III, 80-84, Tr. IV, 53, 60, 103-04.)  Further evidence established that each girl performed at least one sex act in Grand Rapids.   (*See* Tr. III, 84-85, 87-88; Tr. IV, 56, 85, 105-07.)  Taken in a light most favorable to the prosecution, this evidence supports Petitioner's conviction for child sexually abusive activity beyond a reasonable doubt.  Although Petitioner asks the Court to order his release based on inconsistencies among witnesses' trial testimony, the *Jackson* standard precludes this Court from further  reviewing this evidence as to the relative credibility of particular witnesses.  *See Herrera*, 506 U.S. at 401-02.  As a result of this analysis, Petitioner is not entitled to habeas relief based on Ground III.

<u>**Recommended Disposition**</u>

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  January 22, 2007             /s/ Hugh W. Brenneman, Jr.
                                      Hugh W. Brenneman, Jr.
                                      United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).